**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| GARY MOORE, *individually and as the administrator of the* ESTATE OF VINCENT DYER,<br><br>Plaintiffs,<br><br>v.<br><br>SHERRI V. WALLER, ANGELA JACKSON, MATTHEW BROOKS, and DAPHNE HILLMAN,<br><br>Defendants. | Civil Action No.<br><br>5:26-cv-00135-TES<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**[1]

Plaintiff Gary Moore, individually and as the administrator of the Estate of Vincent Dyer, brings this action pursuant to 42 U.S.C. § 1983 arising from his son's preventable death.

1. On August 21, 2024, after correctional staff at Baldwin State Prison got into arguments with Vincent Dyer, those correctional staff abandoned their posts and turned a blind eye as numerous armed aggressors severely attacked Dyer. Incarcerated men were forced to place Dyer into a laundry bin and wheel him for

[1] This Amended Complaint is filed, as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), solely to reflect that Plaintiff Gary Moore has, since the filing of the initial Complaint, been appointed administrator of the Estate of Vincent Dyer. The Amended Complaint contains no other substantive changes from the initial Complaint.

medical assistance because no guards were responsive to this severe attack and medical emergency. By the time EMS arrived, Dyer was dead.

2. Dyer's death did not occur in isolation. The Georgia Department of Corrections is experiencing an epidemic of homicides caused by its officials' failures to take any meaningful action in response to dangerous conditions.

3. Georgia's carceral system is an extreme outlier compared to its peers nationally. For example, Department of Justice Bureau of Justice Assistance statistics show that from 2020 through 2024, Georgia reported 310 homicides in custody, the most of any state in the country, and more than the total number of homicides from California (150), Florida (76), and Texas (68) combined.

4. Indeed, on October 1, 2024, the Department of Justice, after performing a thorough review of Georgia's prisons, including Baldwin State Prison, documented its finding of reasonable cause that the Georgia Department of Corrections had been deliberately indifferent to the basic safety needs of the men and women in its custody.

5. Like other GDC facilities, Baldwin State Prison experienced an alarming rate of homicides in the years preceding Dyer's death, including homicides on at least July 3, 2020, June 15, 2021, July 23, 2021, August 11, 2021, August 21, 2021, May 2, 2023, and October 4, 2023. These deaths reflected the pattern of violence and institutional failures documented by the DOJ in its October 2024 findings.

6. Chronic understaffing at Baldwin State Prison, combined with the systematic failure to conduct required rounds, contraband searches, and other necessary security measures, created conditions where incarcerated persons could

arm themselves with contraband weapons, move between housing areas freely, and carry out violent attacks without intervention by correctional staff.

7. Each of the Defendants in this case knew of the excessive risk of violence at Baldwin State Prison generally. They also knew of the risk to Dyer personally. Despite this knowledge, Defendants took no action to address those risks and instead acted with recklessness in permitting those risks to be realized, resulting in Dyer's death.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claim occurred in this judicial district.

**PARTIES**

10. Plaintiff Gary Moore is Vincent Dyer's father and the administrator of his Estate. He is a resident of Alabama.

11. At all times relevant to this complaint, Defendant Sherri V. Waller was a correctional lieutenant at Baldwin State Prison. She was the lieutenant for the dormitory where Dyer was killed. As lieutenant, she was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting regular rounds in that dormitory. She is sued in her individual capacity. At all times relevant to this complaint, Defendant Waller acted under color of state law.

12. At all times relevant to this complaint, Defendant Angela Jackson was a correctional officer at Baldwin State Prison. As a correctional officer assigned to

Dyer's dormitory, she was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting regular rounds in the dormitory. She is sued in her individual capacity. At all times relevant to this complaint, Defendant Jackson acted under color of state law.

13. At all times relevant to this complaint, Defendant Matthew Brooks was a correctional officer at Baldwin State Prison. As a correctional officer assigned to Dyer's dormitory, he was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting regular rounds in the dormitory. He is sued in his individual capacity. At all times relevant to this complaint, Defendant Brooks acted under color of state law.

14. At all times relevant to this complaint, Defendant Daphne Hillman was a correctional officer at Baldwin State Prison. As a correctional officer assigned to Dyer's dormitory, she was responsible for monitoring the safety and wellbeing of every person housed there, and for conducting and documenting regular rounds in the dormitory. She is sued in her individual capacity. At all times relevant to this complaint, Defendant Hillman acted under color of state law.

**FACTS**

15. During his time at Baldwin State Prison, Dyer sometimes spoke loudly, as a result of his mental health conditions, which was frustrating to correctional staff, including Defendant Jackson.

16. As a result, Defendant Jackson did not like Dyer.

17. At some point in August 2024, Defendant Jackson told Dyer that he was messing with the wrong person.

18. In late August 2024, Dyer was specifically threatened by other inmates at Baldwin State Prison, including Traquan Bangs.

19. He reported those threats to correctional staff.

20. On or about August 20, 2024, Dyer, and others acting on behalf of Dyer, asked correctional staff for Dyer to be moved from his current housing for fear of Dyer being attacked.

21. Defendants took no action to address this risk of attack.

22. On or about August 20, 2024, Dyer alerted correctional staff in writing that he wished to be moved for safety reasons.

23. Defendants took no action to address this safety risk.

24. On or around August 20, 2024, Defendant Hillman heard an inmate state that he planned to kill Dyer.

25. Defendant Hillman took no action to address this risk to Dyer's life.

26. On or shortly before August 21, 2024, Defendant Jackson heard other inmates stating that Dyer was going to get attacked that night.

27. Defendant Jackson laughed. She took no action to address the risk to Dyer's life.

28. Despite having actual knowledge of the specific, imminent threat to Dyer's life from multiple sources – including Dyer's own reports, the list he placed himself on, and direct observations of other incarcerated men's statements – no

Defendant took any action to separate Dyer from his would-be attackers, confiscate or search for contraband weapons, increase monitoring, place him into a protective unit or cell, or otherwise protect him.

29. On or shortly before August 21, 2024, Defendant Jackson recklessly opened a doorway that should have been locked through which incarcerated men, including Traquan Bangs, could access Dyer's dormitory area for the purpose of causing him harm.

30. Defendant Jackson then abandoned her post and went to an unknown place.

31. Several incarcerated men who had been allowed to pass by Defendant Jackson, including Traquan Bangs, proceeded to seek out and attack Dyer.

32. The attackers stabbed Dyer repeatedly in his chest, abdomen, shoulder, forearm, and hand with contraband weapons. Dyer began bleeding profusely.

33. Although prison policy required Dyer's dormitory area to be staffed by at least two correctional staff at the time of the incident, correctional staff were not present and did not respond to this emergency when it happened.

34. Each of Defendants Waller, Jackson, Brooks, and Hillman failed to intervene while Dyer was being attacked.

35. Indeed, no correctional staff responded to the attack at all.

36. The attack lasted an unknown amount of time but for at least 15 minutes.

37. After the attack, the attackers left Dyer for dead.

38. Each of Defendants Waller, Jackson, Brooks, and Hillman failed to respond to the commotion to provide Dyer medical attention in the wake of this attack.

39. Indeed, no correctional staff responded to the attack to see if medical attention was needed.

40. In fact, Defendant Hillman, the only correctional staff person who completed log book entries for Dyer's dormitory area on August 21, 2024, did not notate Dyer's attack at all.

41. As a result, other incarcerated men took it upon themselves to seek medical care for Dyer.

42. To that end, they placed Dyer, who was bleeding excessively from several severe stab wounds, in a laundry bin to move him to seek medical attention.

43. From the laundry bin, Dyer was pleading for his life.

44. While other inmates were pushing Dyer around in a laundry bin seeking medical attention, none of Defendants Waller, Jackson, Brooks, or Hillman performed required regular rounds of Dyer's dormitory area.

45. While other inmates were pushing Dyer around in a laundry bin seeking medical attention, none of Defendants Waller, Jackson, Brooks, or Hillman responded to Dyer's serious, obvious medical need.

46. Eventually, other inmates succeeded in getting Dyer to the prison's medical staff. Dyer continued to plead for his life.

47. By the time EMS was called and arrived, Dyer's heart had stopped. He was transported to the hospital and pronounced dead.

48. Further, the logbook entries for Dyer's dormitory do not accurately reflect the events of the day and days leading to the attack, as they fail to document the threats of harm, the violence, the extended period of unresponsiveness by correctional staff, the contraband weapons, or the transport of a mortally wounded man by incarcerated men through the facility to the medical unit in a laundry bin.

49. After the incident, other correctional staff noticed Defendant Jackson's absence and asked where she had gone.

50. After the incident, Defendants Waller and Jackson were observed laughing about Dyer's death.

## COUNT ONE
### *Deliberate Indifference*
### *42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments*
### *(against all Defendants)*

51. Dyer suffered an objectively serious deprivation of his constitutional rights when correctional staff at Baldwin State Prison created the circumstances for and then failed to prevent the fatal attack described above. He also suffered an objectively serious deprivation of his constitutional rights when correctional staff failed to respond during the attack and the period following the attack when Dyer was being pushed around in a laundry bin seeking medical attention without any response from Defendants.

52. Each individual Defendant actually knew of the high risk, and high rate, of deadly violence within Georgia's prisons and Baldwin State Prison. Each knew of the significant risk to Dyer specifically.

53. Each Defendant knew that their own conduct—including the failure to take any steps to address a known risk of violence to Dyer; failing to conduct contraband searches for weapons in light of the known threat to Dyer's life; permitting attackers into the dormitory area; their prolonged absence from Dyer's dormitory area despite that known risk; and their prolonged absence from Dyer's dormitory area during the period he needed urgent life-saving medical care—caused a substantial risk of serious harm to Dyer.

54. Defendant Hillman, specifically, overheard a death threat made regarding Mr. Dyer and did nothing to respond to that threat of violence.

55. None of the Defendants did anything to address any of the obvious and immediate safety risks to Dyer.

56. Each of the Defendants could have taken efficacious action, but instead they acted with at least criminal recklessness.

57. As a direct result of each Defendants' criminal recklessness, Dyer died.

**<u>COUNT TWO</u>**

***Expenses of Litigation under O.C.G.A. § 13-6-11***

***(against all Defendants)***

58. Plaintiff is entitled to recover expenses personally of litigation under O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense.

## COUNT THREE
***Punitive Damages***
***(against all Defendants)***

59. By engaging in the above-described conduct, the Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences so as to entitle Plaintiff to punitive damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a) Hold a trial by jury upon the issues so triable;

(b) Award Plaintiff nominal, compensatory, special, and punitive damages against Defendants in an amount to be proven at trial to consider both the claims of the estate and the wrongful death of Vincent Dyer;

(c) Award Plaintiff attorneys' fees and expenses under 42 U.S.C. § 1988 and expenses of litigation under O.C.G.A. § 13-6-11;

(d) Tax the costs of this action against Defendants; and

(e) Award any additional or alternative relief as the Court deems proper.

**A JURY TRIAL IS REQUESTED.**

Respectfully submitted this July 6, 2026.

*<u>/s/ Nicolas W. Steenland</u>*
Samantha Funt
Georgia Bar No. 943783
Zack Greenamyre
Georgia Bar No. 293002
Nicolas W. Steenland
Georgia Bar No. 809861

MITCHELL SHAPIRO GREENAMYRE & FUNT LLP
881 Piedmont Ave NE
Atlanta, GA 30309
404-812-4747
404-812-4740 (fax)
sam@mitchellshapiro.com
zack@mitchellshapiro.com
nick@mitchellshapiro.com

## CERTIFICATE OF SERVICE

I hereby certify that I today filed this AMENDED COMPLAINT through the Court's CM/ECF system, which will automatically serve a copy of that filing on all counsel of record.

This 6th day of July, 2026.

/s/ Nicolas W. Steenland
Nicolas W. Steenland
Georgia Bar No. 809861